STUART TOCHNER, CA Bar No. 123758
stuart.tochner@ogletreedeakins.com
KRISTIN N. KOVACICH, CA Bar No. 322454
kristin.kovacich@ogletreedeakins.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone: 213.239.9800
Facsimile: 213.239.9045

GRAHAM M. HOERAUF, CA BAR NO. 307649
graham.hoerauf@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone: 714-800-7900
Facsimile: 714-754-1298

Attorneys for Plaintiff
HUB GROUP, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| HUB GROUP, INC., a Delaware corporation, | Case No. _____ |
|---|---|
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | 1. **VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT (CAL. CIV. CODE § 3426 ET SEQ.)** |
| VERONICA ORTIZ, an individual; DENNIS EARL, an individual; LAZER SPOT, INC., a Georgia corporation; and DOES 1 through 100, inclusive, | 2. **BREACH OF CONTRACT;** |
| | 3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| Defendants. | 4. **BREACH OF FIDUCIARY DUTY OF LOYALTY;** |
| | 5. **UNFAIR BUSINESS PRACTICES (BUS. & PROF. CODE § 17200)** |
| | 6. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| | 7. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| | 8. **CONVERSION;** |
| | 9. **UNJUST ENRICHMENT;** |
| | 10. **VIOLATION OF THE DEFEND** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TRADE SECRETS ACT
(18 U.S.C. § 1836);**
11. **VIOLATION OF COMPUTER
FRAUD AND ABUSE ACT (18
U.S.C. § 1030);**
12. **VIOLATION OF CALIFORNIA
PENAL CODE § 502**

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# INTRODUCTION

1.    Plaintiff HUB GROUP, INC. (hereinafter "Hub Group" or "Plaintiff") files this Complaint for damages and injunctive relief against defendants Dennis Earl ("Earl") and Veronica Ortiz ("Ortiz"), as well as corporate defendant Lazer Spot, Inc. ("Lazer") (collectively, Ortiz, Earl, and Lazer are referred to as "Defendants"), and alleges, upon information and belief, as follows:

# PARTIES

2.    Hub Group is a Delaware corporation licensed to do business in the State of California, with its principal place of business in Illinois.

3.    Defendant Earl is, and at all times relevant was, a citizen and resident of San Bernardino County, California.

4.    Defendant Ortiz is, and at all times relevant was, a citizen and resident of San Bernardino County, California.

5.    Defendant Lazer is, and at all times relevant was, a Georgia corporation with its principal place of business in Georgia.  Lazer provides yard management services throughout North America and has locations in San Bernardino County.

6.    Plaintiff is informed and believes and thereon alleges that the fictitiously-named Defendants sued herein as DOES 1 through 100, inclusive, and each of them, are in some manner responsible for the occurrences, acts and omissions alleged herein and that Plaintiff's damages were proximately caused by their conduct. The true names and capacities of such fictitiously-named DOE Defendants, whether individual, corporate, partnership, associate or otherwise, are presently unknown to Plaintiff, and Plaintiff will seek leave of Court to amend this Complaint to assert the true names and capacities of such fictitiously-named Defendants when the same have been ascertained. For convenience, each reference to any of the named Defendants herein shall also refer to DOES 1 through 100, inclusive.

7.    Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, were and are the agents, employees, partners, joint venturers, co-

conspirators, owners, principals and/or employers of the remaining Defendants, and at all times herein mentioned were and are acting within the course and scope of such agency, employment, partnership, conspiracy, ownership and/or joint venture. Plaintiff is further informed and believes and based thereon alleges that the acts and conduct herein alleged of each such defendant were known to, authorized by and/or ratified by the other Defendants, and each of them.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise from a federal question under the Defend Trade Secrets Act and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

9.      The Court has supplemental jurisdiction over the remaining causes of action pursuant to 28 U.S.C. § 1367 as each is related to the claim for which original federal question jurisdiction attaches, and each forms part of the same claim or controversy under Article III of the United States Constitution.

10.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  The parties are residents of different States and the amount in controversy exceeds $75,000.

11.      This Court has personal jurisdiction over the Defendants because both defendants Ortiz and Earl are residents of this District, and defendant Lazer conducts substantial and regular business in this District.

12.      The Central District of California is a proper venue for this matter pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims set forth herein occurred in this District.

## GENERAL ALLEGATIONS

13.      Hub Group is an innovative end-to-end supply chain solutions company that delivers transportation and logistics management solutions across numerous industries. One such solution is Hub Dedicated, Hub Group's dedicated trucking

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

46515876_1.docx

operation, which offers clients the in-house service advantages of a private fleet with the convenience of a for-hire carrier. The drivers provided by Hub Dedicated haul freight for one primary customer, provide personalized services based on the customer's business needs, and become integrated and familiar with the customer's personnel, their schedules and their routes.

14.    For over 15 years, Earl provided services to Hub Dedicated, and most recently served as its Director of Operations. In this role, Earl acquired detailed knowledge of and had access to all aspects of Hub Group's dedicated trucking operations, including its confidential, proprietary and/or otherwise commercially sensitive information, including but not limited to, customer lists and contact information; driver lists, salary and contact information; customer details including those related to profit margin, customer route data, inventory, budgets and preferences, as well as its current driver and hostler needs; and Hub Group's business, sales and marketing strategies and plans (collectively, the "Confidential Information").

15.    Hub Group has invested considerable time, effort, and expense in establishing and developing this information.

16.    Part of Hub Group's continued success is attributable to its development of this information, and it derives a competitive advantage not enjoyed by other persons not in possession of the information.

17.    On July 7, 2017, as a condition of his employment, Earl signed a Proprietary Interest Protection Agreement. A true and correct copy of the Agreement is attached as Exhibit A.

18.    The Agreement specifically provides, in relevant part:

> I understand that I am or will be employed by Hub in a sensitive capacity in which I will learn and have access to Hub's confidential and proprietary information and trade secrets. I understand that the products and services that Hub develops, provides and markets are unique and constitute confidential and proprietary information and trade secrets. Further, I know that my promises in this Agreement are an important way for Hub to protect its confidential and proprietary information and trade secrets.

46515876_1.docx

I agree these recitals are material terms of this Agreement.

In addition to other good and valuable consideration, I am expressly being given employment, continued employment, certain monies, benefits, options, restricted stock, and/or trade secrets and confidential information of Hub and its customers, suppliers, vendors or affiliates to which I would not have access to but for my employment by Hub in exchange for this Agreement. In consideration of the foregoing, I agree as follows:

1. **Protection of Confidential Information** I will not, without Hub's prior permission, directly or indirectly utilize for any purpose other than for a legitimate business purpose solely on behalf of Hub, or directly or indirectly disclose to anyone outside of Hub, either during or after my employment or relationship with Hub ends, Hub's Confidential Information. . .

Examples of Confidential Information include, but are not limited to, customer lists, customer information, customer contacts, the identity of suppliers, pricing, margins, business plans, marketing plans, business and customer strategy, technical know-how, formulae, processes, designs, prototypes, models, software, solutions, research and development, information that Hub has received from a third party and is required to hold confidential in connection with an agreement between Hub and such third party, and any other information that I obtain from Hub that could reasonably be expected to be deleterious to Hub if disclosed to third parties.

19.     As a result of the foregoing, Earl was acutely aware of his obligations to maintain the confidentiality of Hub Group's Confidential Information, trade secrets, and the information of Hub Group's customers.

20.     On March 1, 2021, Earl left Hub Group and took a position with Lazer, a direct competitor of Hub Group.

21.     After Earl left Hub Group, he remained in contact with Veronica Ortiz, an employee in Hub Dedicated with whom he worked closely for many years while at Hub Group.

22.     Ortiz was employed by Hub Group as a Site Manager in its dedicated trucking group, and she oversaw a customer's regional distribution center in Redlands. Hub Dedicated handled all incoming and outgoing goods for the customer at this regional distribution center.

23.     As a condition of her employment with Estenson Logistics, LLC, a company acquired by Hub Group which now functions as Hub Dedicated, Ortiz signed

4

a Confidentiality of Proprietary Information Agreement ("the Confidentiality Agreement") on May 2, 2012. A true and correct copy of the Confidentiality Agreement is attached as Exhibit B.

24.    By signing this agreement, Ortiz agreed to and acknowledged that she would be "provided with access to certain proprietary information, such as vendor lists, customer lists, consumer rates, traffic lanes/routes, training materials, trade secrets and technological data" and "that all such confidential proprietary information is extremely sensitive and that the release of any such information constitutes a breach of my duty of loyalty."

25.    The Confidentiality Agreement further states that, in consideration of her continued employment, Ortiz agrees "not to disclose or otherwise disseminate any confidential or proprietary information to any individual or entity except at the expressed written direction of a member of [Hub] senior management."

26.    In direct contravention of these agreements, since at least March 8, 2021, Earl, through his Lazer email account, and Ortiz, through her Hub Group email account, have exchanged at least 50 emails containing confidential, proprietary and trade secret information relating to Hub's Dedicated trucking operations. This information includes, but is not limited to, the following:

(a)    A spreadsheet listing every driver employed by Hub Dedicated across the country by name, date of hire and site location. The spreadsheet includes information on over a thousand of Hub Dedicated's drivers. The spreadsheet originated from Earl's Lazer email account, indicating that he was already in possession of misappropriated the information while working at Lazer.

(b)    Information regarding Hub Dedicated's driver counts at one customer's 12 different facilities in California, including Hub Dedicated's current driver and hostler needs, its contracted and core driver counts, active and inactive driver counts, contracted and core hostler counts, and active and inactive hostler counts.

5

46515876_1.docx

(c)    A spreadsheet containing a PDF of Hub Group's yard services agreement with the same Southern California customer, including the following contractually agreed fees for the yard services Hub Group provides to the customer: Base Yard Fixed Weekly rates, Yard Driver per Hour fees, Offsite Yard Shuttle fees, daily and weekly adds/deletes for Incremental Yard Tractors, Incremental Driver fees, and Short and Long Term Day Cab rates.  The spreadsheet also includes yard switcher budgets for Hub Dedicated's operations at the Redlands regional distribution center from 2017 to the present as well as actual financial performance of the yard operations against the budgets over that period.  This information gives Lazer Spot a full financial understanding of Hub Group's yard spotting operational performance at the Redlands regional distribution center over the last four years.

(d)    A summary of issues in the Redlands regional distribution center including a complaint by Ortiz about the customer's yard staffing decisions, to which Earl responds, "I will be in a position to let the building fail based on [the customer's] decision not to staff right."

(e)    Data on lanes to and from the above-referenced customer's regional distribution center in Southern California, including a spreadsheet listing thousands of specific lanes including origin, destination and number of loads per lane.  This constitutes a roadmap for back-solicitation by a Hub Group competitor.

27.    Further, Earl and Ortiz exchanged numerous emails while Ortiz was employed by Hub Group in which Earl describes his plans to take over the customer's business from Hub Group for Lazer.

28.    Specifically, Earl and Ortiz collaborated on staffing and pay for the drivers and supervisors Lazer intends to hire.  At one point, Earl asks Ortiz, at the time a current Hub Group employee, her thoughts on hiring Hub Group employees:  "Need thoughts on any internal candidates."

29.    Earl also forwarded to Ortiz, at her Hub Group email address, an email between Phil Newsome, Lazer's Chief Operations Officer, and a manager employed

by the above-referenced customer in which Newsome tells the manager that Earl will be leading the team transitioning the yard business from Hub Group to Lazer. The manager responds that he is pleased Earl is leading the team and "if Hub goes radio silence, I will engage."

30.    Hub Group terminated Ortiz's employment as soon as it became aware of her involvement in the misappropriation of Hub Group's Confidential Information.

31.    Based on information and belief, Defendants have knowledge and possession of Hub Group's Confidential Information and trade secrets and Defendants are continuing to use that information to unlawfully solicit Hub Group's customers and employees, including but not limited to its truck drivers.

32.    Defendants have damaged the competitive advantage created by Hub Group through its own diligent efforts and its expenditure of resources by using Hub Group's Confidential Information, including, but not limited to trade secrets and proprietary information. Furthermore, by transmitting and conveying Hub Group's confidential and proprietary information in and among themselves and among other currently unknown entities, Defendants and those working in concert with them have diminished Hub Group's goodwill and standing in its industry and market among its customers, employees, partners, affiliates, and other related entities.

33.    By usurping Hub Group's Confidential Information, Defendants, and those working in concert with them, have created an unlawful and unfair competitive advantage over Hub Group in that they are now privy to Hub Group's confidential and proprietary trade secret information pertaining to Hub Group's clients, employees, costs, and data. Defendants' knowledge of Hub Group's confidential and trade secret information creates a competitive disadvantage for Hub Group because Defendants are using Hub Group's proprietary information to compete and take business away from Hub Group.

34.    Hub Group brings this action to preserve its valuable rights, to prevent Defendants from unfairly competing using Hub Group's Confidential Information and

46515876_1.docx

to obtain injunctive relief, as well as compensation for the damages caused by Defendants' wrongful conduct.

## CLAIM FOR RELIEF 1:

## VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT (CAL. CIV. CODE § 3426 ET SEQ.)

### (Against All Defendants)

35.    Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

36.    California Civil Code section 3425.1, subdivision (b) defines trade secret misappropriation as: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limits its use; or (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake."

37.    At all times relevant herein, Hub Group is and was the rightful owner of certain proprietary and confidential information, including but not limited to, customer lists and contact information; driver lists, salary and contact information; customer details including those related to profit margin, customer route data, inventory, budgets and preferences, as well as its current driver and hostler needs; and Hub Group's business, sales and marketing strategies and plans.  Such proprietary and confidential information shall be hereinafter referred to as Hub Group's "Trade Secrets."

46515876_1.docx

38.    The Trade Secrets have independent economic value in that, *inter alia*, (a) Hub Group has invested time, effort, and money in developing its Trade Secrets; and (b) the Trade Secrets enable Hub Group to provide its customers with services and products that are more effective, efficient, and financially attractive than its competitors.  As a result, Hub Group's Trade Secrets have economic value because Hub Group was and is able to more effectively and efficiently serve its customers than competitors who did and do not have access to the Trade Secrets.

39.    At all times relevant herein, Hub Group has made reasonable efforts to ensure that its Trade Secrets remain confidential by, *inter alia*, not disclosing such information to the public or to Hub Group's competitors, and by restricting the use of such information by Hub Group's own employees through, among other ways, the use of the Proprietary Interest Protection Agreement and the Confidentiality Agreement.

40.    In their positions with Hub Group, Earl and Ortiz were permitted access to and thereby utilized Hub Group's Trade Secrets in connection with their duties to service the needs of Hub Dedicated's customers.  This information was subject to the contractual restrictions described *supra*.

41.    Earl and Ortiz misappropriated and wrongfully and without authorization used Hub Group's Trade Secrets to solicit business for Earl's own benefit, and for the benefit of Hub Group's competitor, Lazer, from Hub Group's current and prospective customers, as described *infra*.  Earl, Ortiz and Lazer's conduct was in violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*).

42.    As a proximate result of the misappropriation of Hub Group's Trade Secrets, Hub Group has suffered and continues to suffer actual damages in an amount according to proof.  Hub Group is informed, believes, and thereon alleges that Defendants have been unjustly enriched by their misappropriation of Hub Group's Trade Secrets.  Hub Group is therefore entitled to recover for the unjust enrichment caused by their misappropriation that is not otherwise taken into account in computing Hub Group's actual damages, pursuant to Cal. Civ. Code § 3426.3(a).

43.   Hub Group is informed, believes, and thereon alleges that Defendants acted knowingly, willfully, maliciously, and with intent to harm Hub Group when they misappropriated and wrongfully used Hub Group's Trade Secrets with a deliberate intent to injure Hub Group's business and improve their own.  Hub Group is therefore entitled to recover punitive and/or exemplary damages pursuant to Cal. Civ. Code § 3426.3(c), and entitled to recover an award of reasonable attorneys' fees and costs, pursuant to Cal. Civ. Code § 3426.4.

44.   Defendants misappropriated and wrongfully used Hub Group's Trade Secrets.  Unless and until Defendants are enjoined and restrained by order of this Court, Defendants will cause great and irreparable harm to Hub Group's business.  The misappropriation of this information puts Hub Group at a competitive disadvantage, and Hub Group will continue to lose business as a result of this corporate sabotage.  Defendants' wrongful conduct will continue to cause incalculable damage to Hub Group's future efforts to do business and obtain new business and threatens to ruin Hub Group's business.  In addition, Hub Group's loss of future earnings due to the actions of Defendants would be extremely difficult, if not impossible, to ascertain.  Hub Group has no adequate remedy at law, should Defendants' wrongful conduct be allowed to continue.

45.   Hub Group is therefore entitled to injunctive relief pursuant to Cal. Civ. Code § 3426.2, and requests that the Court issue a temporary restraining order, a preliminary injunction, and a permanent injunction that:

(a)   Prohibits Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from using, disclosing, or transmitting Hub Group's sensitive, proprietary, or confidential information or trade secrets specifically identified above, including but not limited to Hub Group's client and employee information;

(b)   Requires Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, to immediately account for and return to Hub

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Group all original documents, records, and materials containing or reflecting such information, and all copies thereof;

       (c)    Prohibits Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from soliciting or handling business from any former, current or prospective customers of Hub Group, based in whole or in part on any sensitive, confidential, or proprietary information or trade secret belong to Hub Group;

       (d)    Prohibits Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from handling business from the customer of Hub Group described in Paragraph 26, above;

       (e)    Requires Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, to submit their computers and electronic devices at their expense to a computer forensic expert of Hub Group's choosing to ensure that Hub Group's trade secrets and confidential or proprietary data do not exist on those computers or devices and have not been further disseminated;

       (f)    Except and only to the extent otherwise required by Court order, prohibits Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from destroying, altering, transmitting, or moving any documents, in whatever form, that may contain or reflect any of Hub Group's sensitive, proprietary, or confidential information or trade secrets; and

       (g)    Prohibits or requires any and all other such acts as the Court deems appropriate for injunctive relief.

## CLAIM FOR RELIEF 2:

### BREACH OF CONTRACT

### (Against Defendant Earl and Ortiz)

46.    Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

/ / /

46515876_1.docx

47.     Earl voluntarily entered into and executed the Proprietary Interest Protection Agreement, attached as Exhibit A to this Complaint, which was a binding contract that required ongoing mutual duties between the parties.

48.     The Proprietary Interest Protection Agreement was entered into by Earl for the valuable consideration of his employment with Hub Group.

49.     The Agreement specifically provides, in relevant part:

I understand that I am or will be employed by Hub in a sensitive capacity in which I will learn and have access to Hub's confidential and proprietary information and trade secrets. I understand that the products and services that Hub develops, provides and markets are unique and constitute confidential and proprietary information and trade secrets. Further, I know that my promises in this Agreement are an important way for Hub to protect its confidential and proprietary information and trade secrets.

I agree these recitals are material terms of this Agreement.

In addition to other good and valuable consideration, I am expressly being given employment, continued employment, certain monies, benefits, options, restricted stock, and/or trade secrets and confidential information of Hub and its customers, suppliers, vendors or affiliates to which I would not have access to but for my employment by Hub in exchange for this Agreement. In consideration of the foregoing, I agree as follows:

1. **Protection of Confidential Information** I will not, without Hub's prior permission, directly or indirectly utilize for any purpose other than for a legitimate business purpose solely on behalf of Hub, or directly or indirectly disclose to anyone outside of Hub, either during or after my employment or relationship with Hub ends, Hub's Confidential Information. . .

Examples of Confidential Information include, but are not limited to, customer lists, customer information, customer contacts, the identity of suppliers, pricing, margins, business plans, marketing plans, business and customer strategy, technical know-how, formulae, processes, designs, prototypes, models, software, solutions, research and development, information that Hub has received from a third party and is required to hold confidential in connection with an agreement between Hub and such third party, and any other information that I obtain from Hub that could reasonably be expected to be deleterious to Hub if disclosed to third parties.

50.     Likewise, Ortiz voluntarily entered into and executed the Confidentiality Agreement, attached as Exhibit B to this Complaint, which was a binding contract that required ongoing mutual duties between the parties.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

51.    The Confidentiality Agreement was entered into by Ortiz for the valuable consideration of her employment with Hub Group.

52.    By signing this agreement, Ortiz agreed to and acknowledged that she would be "provided with access to certain proprietary information, such as vendor lists, customer lists, consumer rates, traffic lanes/routes, training materials, trade secrets and technological data" and "that all such confidential proprietary information is extremely sensitive and that the release of any such information constitutes a breach of my duty of loyalty."

53.    The Confidentiality Agreement further states that, in consideration of her continued employment, Ortiz agrees "not to disclose or otherwise disseminate any confidential or proprietary information to any individual or entity except at the expressed written direction of a member of [Hub] senior management."

54.    Hub Group performed pursuant to and in accordance with the terms of the Proprietary Interest Protection Agreement and Confidentiality Agreement at all times material to both agreements.

55.    Hub Group, having faithfully performed all its duties, obligations, and actions under the Proprietary Interest Protection Agreement and Confidentiality Agreement, faithfully required and expected Earl and Ortiz's continued performance under the agreement to which each was a party.

56.    By executing the Proprietary Interest Protection Agreement, Earl expressly agreed to abide by the terms of his contract with Hub Group.  Similarly, by executing the Confidentiality Agreement, Ortiz expressly agreed to abide by the terms of her contract with Hub Group.

57.    Earl breached the Proprietary Interest Protection Agreement by knowingly and willfully using Hub Group's Trade Secrets to wrongfully attempt to acquire, and actually did acquire, business for his own benefit, and for the benefit of Lazer, from Hub Group's former, current, and prospective clients.

/ / /

58.    Earl materially breached the Proprietary Interest Protection Agreement by, *inter alia*, willfully revealing Hub Group's confidential and proprietary information to third party competitors, including but not limited to Lazer.  Upon information and belief, such information included the Trade Secrets and confidential information enumerated above.

59.    Ortiz materially breached the Confidentiality Agreement by, *inter alia*, willfully transmitting and revealing Hub Group's confidential and proprietary information to third party competitors, including but not limited to Earl and Lazer. Upon information and belief, such information included the Trade Secrets and confidential information enumerated above.

60.    Hub Group's goodwill, reputation, and livelihood have been incalculably damaged by Earl's breach of the Proprietary Interest Protection Agreement and by Ortiz' breach of the Confidentiality Agreement, and Hub Group has lost calculable revenue from its clients and prospective clients, in amounts according to proof.

61.    Additionally, Hub Group has suffered irreparable harm as a result of Earl and Ortiz's acts and will continue to suffer irreparable injury that cannot adequately be remedied at law unless Earl and Ortiz enjoined from engaging in and/or benefitting from any further breaches of the Proprietary Interest Protection Agreement including, (a) misappropriating, utilizing, or disclosing to others any of Hub Group's Trade Secrets; (b) using Hub Group's Trade Secrets to solicit business from any former, current, or prospective customers of Hub Group; (c) transferring or publishing any proprietary information belonging to Hub Group; and (d) destroying any records or documents relating to the Trade Secrets, customers, clients, and business of Hub Group.

62.    Earl and Ortiz's acts threaten Hub Group's operations and have and will continue to cause a loss of customers and business.

/ / /

/ / /

46515876_1.docx

63.    Earl's breach of the Proprietary Interest Protection Agreement and Ortiz's breach of the Confidentiality Agreement were an actual and proximate cause of Hub Group's harm, in amounts according to proof.

## CLAIM FOR RELIEF 3:

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Defendant Earl)

64.    Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

65.    A written contract existed both between Hub Group and Earl when they executed the Proprietary Interest Protection Agreement and between Hub Group and Ortiz when they executed the Confidentiality Agreement.

66.    There is inherent in every contract an implied covenant that no party will intentionally do anything or fail to do something to deprive the other of the benefit of the contract.

67.    Earl and Ortiz's obligation to act in good faith with Hub Group was created by their execution of their respective agreements, which are lawfully binding contracts.

68.    Earl and Ortiz failed to act in good faith by, *inter alia*, accessing and misappropriating Hub Group's Trade Secrets for their own benefit, and the benefit of Lazer, and in a manner inconsistent with the terms agreed-upon by and between Hub Group and each of them.

69.    As a direct and proximate cause of Earl and Ortiz's breach of the implied covenant of good faith and fair dealing, Hub Group has suffered and continues to suffer damages in an amount according to proof.

/ / /

/ / /

/ / /

## CLAIM FOR RELIEF 4:

## BREACH OF FIDUCIARY DUTY OF LOYALTY

### (Against Defendants Earl and Ortiz)

70.  Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

71.  Hub Group employed Earl as a Director of Operations and Ortiz as a Site Manager.  During their respective employments with Hub Group, they were under a duty to (a) provide their full attention and effort to their work for Hub Group; and (b) act solely for the benefit of Hub Group and not contrary to Hub Group's interests with respect to all matters connected with their employment relationship.  California law imposes such duties on employees, pursuant to sections 2860 and 2863 of the California Labor Code.

72.  Earl and Ortiz, in their capacities as Director of Operations and Site Manager, occupied positions of trust and confidence with Hub Group and therefore had a fiduciary duty to exercise the utmost good faith and loyalty to Hub Group.

73.  In the course and scope of Earl and Ortiz's employment with Hub Group, they were granted access to and entrusted with Hub Group's highly sensitive confidential information and Trade Secrets, compiled by Hub Group over years of business, with the express understanding and agreement that the confidential information and Trade Secrets would be used by Earl and Ortiz solely within the scope of their employment with Hub Group and solely for the benefit of Hub Group.

74.  Earl and Ortiz's fiduciary duties created a further duty in them to not disclose, transmit, use, misuse, or misappropriate any of Hub Group's confidential information or Trade Secrets in a manner inconsistent with those duties.

75.  Earl and Ortiz breached the fiduciary duties they owed to Hub Group by, *inter alia*, disclosing, transmitting, using and misusing, and misappropriating Hub Group's confidential information and Trade Secrets for their own personal gain and for the benefit of Lazer, Earl's subsequent employer.

76.     Earl and Ortiz further breached the fiduciary duties they owed to Hub Group by, *inter alia*, using Hub Group's confidential information and Trade Secrets to assist Earl's subsequent employer, Lazer, a competitor of Hub Group.

77.     As a direct and proximate result of Earl and Ortiz's breach of the fiduciary duties they owed to Hub Group, Hub Group has suffered and continues to suffer damages in an amount according to proof.

78.     Earl and Ortiz's conduct as alleged herein is a violation of the fiduciary duties and obligations they owed to Hub Group and knew or otherwise were aware that the owed the same to Hub Group, and the conduct was and continues to be willful, intentional, malicious, and oppressive, thereby justifying an award of punitive damages against Earl and Ortiz.

## CLAIM FOR RELIEF 5:

## UNFAIR BUSINESS PRACTICES (BUS. & PROF. CODE § 17200)

## (Against All Defendants)

79.     Hub Group incorporates herein by reference all other paragraphs of this Complaint though fully set forth herein.

80.     Earl and Ortiz's unlawful conduct includes the breach of their fiduciary duty of loyalty and sections 2860 and 2863 of the California Labor Code, and violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq*.), as detailed *supra*.

81.     Lazer's unlawful conduct includes violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq*.), as detailed *supra*.

82.     Hub Group is informed, believes, and thereon alleges that Defendants actions were specifically designed to undermine competition in Hub Group's industry and to specifically attack Hub Group.

83.     In addition to being illegal and in breach of Proprietary Interest Protection Agreement and Confidentiality Agreement, Defendants' conduct has allowed Defendants an unfair competitive advantage by, *inter alia*, usurping Hub Group's

46515876_1.docx

confidential information and Trade Secrets to divert Hub Group's then-current and prospective clients and customers to Lazer.

84.    Such conduct constitutes unlawful, unfair, and/or fraudulent business practices prohibited by section 17200 *et seq*. of the California Business and Professions code.

85.    Defendants' conduct threatens injury to Hub Group because it will cause damage to Hub Group's business, cause further loss of goodwill and loss of revenue, threaten to ruin its business and reputation, and have an adverse impact on employee morale, all of which will cause irreparable harm to Hub Group.

86.    Hub Group therefore requests this Court to issue an order pursuant to Business and Professions Code § 17203 *et seq*. mandating that Defendants, and anyone else working in concert with them (a) disgorge and return to Hub Group any property that Defendants or anyone else working in concert with them unlawfully took from Hub Group, and (b) disgorge to Hub Group any money or profits generated by Defendants as a result of their unfair competition.

## CLAIM FOR RELIEF 6:
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (Against All Defendants)

87.    Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

88.    Hub Group has existing and prospective business and economic relationships with various customers and clients in its industry.

89.    At all relevant times, Defendants knew or were otherwise aware of Hub Group's existing and anticipated/expected relationships with customers and clients in the industry, and of Hub Group's probability of future economic benefit from those relationships, particularly due to Earl and Ortiz's positions as Hub Group's Director of Operations and Site Manager, respectively.

46515876_1.docx

90.    At all relevant times, Defendants were aware, or should have been reasonably aware that, if they did not act with due care, their acts would interfere with or disrupt Hub Group's prospective economic advantage, particularly due to Earl and Ortiz's positions as Hub Group's Director of Operations and Site Manager, which gave them access to Hub Group's confidential information and Trade Secrets relating to Hub Group's core business and Hub Group's existing and prospective economic advantage.

91.    Defendants failed to act with reasonable care by engaging in wrongful conduct such as, but not limited to, misappropriating Hub Group's confidential information and Trade Secrets in a manner inconsistent with and not for the benefit of Hub Group's business, in violation of the Proprietary Interest Protection Agreement and the Confidentiality Agreement that Earl and Ortiz entered into with Hub Group, and in violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq*.).

92.    Defendants engaged in wrongful conduct such as, but not limited to, misusing Hub Group's Trade Secrets in a manner inconsistent with and not for the benefit of Hub Group's business, but for the purpose of growing Lazer's business, in violation of the Proprietary Interest Protection Agreement and the Confidentiality Agreement that Earl and Ortiz entered into with Hub Group and in violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq*.).

93.    As a result of Defendants' conduct, not only have Hub Group's relationships with its clients been harmed, but Hub Group has also suffered actual damage to its business and trade, including but not limited to, having lost clients who would have otherwise continued to conduct business with Hub Group or begun to conduct business with Hub Group.  Defendants' conduct was a substantial factor in causing Hub Group's harm.

94.    The aforementioned conduct of Defendants was willful and in doing the acts identified above, Defendants are guilty of oppression, fraud, and/or malice

justifying punitive and exemplary damages in an amount sufficient to punish each Defendant.

### CLAIM FOR RELIEF 7:

### NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### (Against All Defendants)

95.    Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

96.    Hub Group has existing and prospective business and economic relationships with various customers and clients in its industry.

97.    At all relevant times, Defendants knew or were otherwise aware of Hub Group's existing and anticipated/expected relationships with customers and clients in the industry, and of Hub Group's probability of future economic benefit from those relationships, particularly due to Earl and Ortiz's positions as Hub Dedicated's Director of Operations and Site Manager, respectively.

98.    At all relevant times, Defendants were aware, or should have been reasonably aware that if they did not act with due care, their acts would interfere with or disrupt Hub Group's prospective economic advantage, particularly due to Earl and Ortiz's positions as Hub Group's Director of Operations and Site Manager, which made them privy to Hub Group's confidential information and Trade Secrets relating to Hub Group's dedicated trucking business and Hub Group's existing and prospective economic advantage.

99.    Defendants failed to act with reasonable care by engaging in wrongful conduct such as, but not limited to, misappropriating Hub Group's confidential information and Trade Secrets in a manner inconsistent with and not for the benefit of Hub Group's business, in violation of the Proprietary Interest Protection Agreement and Confidentiality Agreement that Earl and Ortiz entered into with Hub Group and

46515876_1.docx

in violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*).

100.   Defendants engaged in wrongful conduct such as, but not limited to, misusing Hub Group's Trade Secrets in a manner inconsistent with and not for the benefit of Hub Group's business, but for the purpose of growing Lazer's business, in violation of the Proprietary Interest Protection Agreement and Confidentiality Agreement that Earl and Ortiz entered into with Hub Group and in violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*).

101.   As a result of Defendants' conduct, not only have Hub Group's relationships with its clients been harmed, but Hub Group has also suffered actual damage to its business and trade, including but not limited to, having lost clients who would have otherwise continued to conduct business with Hub Group or begun to conduct business with Hub Group.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

102.   The aforementioned conduct of Defendants was willful and in doing the acts identified above, Defendants are guilty of oppression, fraud, and/or malice justifying punitive and exemplary damages in an amount sufficient to punish each Defendant.

## CLAIM FOR RELIEF 8:

## CONVERSION

## (Against All Defendants)

103.   Hub incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

104.   At all times, the confidential information and Trade Secrets that Earl and Ortiz had access to during their employment with Hub Group was and is the property of Hub Group.

/ / /

/ / /

46515876_1.docx

105.    Earl and Ortiz were privy to Hub Group's confidential information and Trade Secrets for the sole purpose of enabling them to perform their job duties for Hub Group, and nothing more.

106.    During Earl and Ortiz's employment with Hub Group, Hub Group was unequivocally clear about the extent to which they were authorized to use Hub Group's confidential information and Trade Secrets, i.e., only for "a legitimate purpose solely on behalf of Hub" per the Proprietary Interest Protection Agreement.

107.    Defendants intentionally misappropriated, misused and used Hub Group's confidential information and Trade Secrets without Hub Group's authorization and Hub Group never consented to such use by Defendants, thereby converting Hub Group's property.

108.    Defendants intentionally took possession, control, and custody of Hub Group's property without Hub Group's authorization, permission, or otherwise, thereby converting Hub Group's property.

109.    Defendants intentionally misappropriated, misused, and used Hub Group's confidential information and Trade Secrets for their own benefit, which is inconsistent with the purposes for which Hub Group entrusted Earl and Ortiz with their confidential information and Trade Secrets.

110.    Defendants' conversion of Hub Group's property is apparent from the customers and clients Hub Group has lost since Defendants' conversion of their property.

111.    To date, Defendants have not returned Hub Group's property or otherwise relinquished control to Hub Group of Hub Group's property.

112.    Hub Group has suffered and continues to suffer damages as a proximate and actual cause of Defendants' conduct, in an amount according to proof.

113.    As a consequence of Defendants' conversion, Hub Group is entitled to repossession of all property that Defendants converted, as well as all profits that Defendants have acquired in connection with and as a result of their conversion.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

114.   Defendants' conduct was intentional, willful, malicious, and oppressive thereby entitling Hub Group to punitive and exemplary damages.

## CLAIM FOR RELIEF 9:

## UNJUST ENRICHMENT

## (Against All Defendants)

115.   Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

116.   Defendants engaged in unlawful conduct by, *inter alia*, misappropriating Hub Group's confidential information and Trade Secrets and used them for their own benefit.

117.   Hub Group is informed, believes, and thereon alleges that Defendants' misappropriation of, *inter alia*, Hub Group's confidential information and Trade Secrets caused Defendants to receive benefits including, but not limited to, monetary compensation and other opportunities created by Defendants' unjust usurpation and diversion of Hub Group's property, that they otherwise would not have achieved.

118.   Based on the circumstances described herein, it is unjust for Defendants to retain such benefits.

119.   The reasonable value of the benefits Defendants unlawfully received must be disgorged by Defendants.

120.   Hub Group suffered and continues to suffer damages in amounts according to proof.

## CLAIM FOR RELIEF 10:

## VIOLATION OF THE DEFEND TRADE SECRETS ACT

## (18 U.S.C. § 1836)

## (Against All Defendants)

121.   Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

/ / /

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

46515876_1.docx

122.   The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

123.   Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically…or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

124.   Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

125.   Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

126.   At all times relevant to this Complaint, Hub Group is/was the rightful owner of certain proprietary and confidential information, as set forth in this Complaint and incorporated herein, including but not limited to client and proprietary information.   The confidential information was intended for use and was used in interstate commerce.

127.   Defendants have acquired confidential, proprietary, and/or otherwise commercially sensitive information belonging to Hub Group, including but not limited to, customer lists and contact information; driver lists, salary and contact information; customer details including those related to profit margin, customer route data, inventory, budgets and preferences, as well as its current driver and hostler needs; and Hub Group's business, sales and marketing strategies and plans.

128.   This confidential information has independent economic value in that, among other things: (a) Hub Group has invested time, effort, and money in developing these Trade Secrets; and (b) these Trade Secrets enable Hub Group to provide its customers with services which are more effective, efficient, and financially attractive than the services offered by its competitors. As a result, these Trade Secrets have economic value in that Hub Group was/is able to more effectively and efficiently serve its clients than competitors who do not have access to these Trade Secrets and who did not expend the resources to develop them.

129.   At all times relevant to this Complaint, Hub Group has made reasonable efforts to ensure that these Trade Secrets remained confidential, by not disclosing such information to the public or Hub Group's competitors, and by restricting the use of such information by Hub Group's employees, including, but limited to, the use of

contracts and policies to secure employee protection of Hub Group's confidential information used in the execution of their duties to Hub Group.

130.   In their positions with Hub Group, Defendants Earl and Ortiz were permitted access to and utilized Hub Group's Trade Secrets in their efforts to facilitate the delivery of Hub Group's services and to otherwise service the needs of Hub Group's current or prospective clients, subject to the terms set forth in and subject to the terms set forth in the Confidentiality Agreement and the Proprietary Interest Protection Agreement, which governed Ortiz and Earl's employment with Hub Group.

131.   As set forth above, Defendants Earl and Ortiz misappropriated and wrongfully used, conveyed, and transmitted Hub Group's Trade Secrets to Defendant Lazer as well as other confidential business information in an attempt to solicit business for their own benefit from Hub Group's current and prospective clients. The conduct of Defendants Earl, Ortiz and Lazer violates the Defend Trade Secrets Act.

132.   Defendants Earl, Ortiz and Lazer at all relevant times were aware, or had reason to know, that the information they were transmitting and using was a Trade Secret of Hub Group that was acquired by improper means and that had been improperly disclosed.

133.   As a proximate result of their conduct, Hub Group has been damaged in an amount according to proof at time of trial.

134.   In engaging in the wrongful conduct described herein, Defendants Earl, Ortiz and Lazer have acted and continue to act in a manner that is willful, wanton, despicable, intentional, malicious, oppressive, and fraudulent, thus entitling Hub Group to punitive and exemplary damages against Defendants Earl, Ortiz and Lazer, and each of them.

135.   Hub Group is entitled to actual damages from Defendants, and each of them, and for attorney's fees and costs.

136.   Because Hub Group's damages cannot be adequately compensated through remedies at law alone, Hub Group also seeks preliminary and permanent

46515876_1.docx
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

injunctive relief to recover and protect its confidential, proprietary, and trade secret information from Defendants Earl, Ortiz and Lazer and anyone to whom they have wrongfully conveyed or disclosed such Trade Secrets.  Hub Group will continue to suffer irreparable harm absent injunctive relief from this Court.

### CLAIM FOR RELIEF 11:

### VIOLATION OF COMPUTER FRAUD AND ABUSE ACT

### (18 U.S.C. § 1030 ET SEQ.)

### (Against All Defendants)

137.  Hub Group incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

138.  As employees of Hub Group, Earl and Ortiz intentionally accessed valuable Hub Group information, stored on a protected computer and computer network owned by Hub Group.  The information constitutes highly sensitive confidential and proprietary information belong to Hub Group.

139.  Based on information and belief, while employed at Hub Group, defendant Earl sent Hub Group's highly sensitive confidential and Trade Secret information to himself for use during his subsequent employment at Lazer, in violation of the Proprietary Interest Protection Agreement.  Thus, Earl accessed the information in a manner that exceeded his original authorization by Hub Group.

140.  While employed at Hub Group, defendant Ortiz intentionally accessed valuable information, stored on a protected Hub Group computer after the owner of the computer, Hub Group, directed Ortiz and its employees to not share the confidential business information.  Defendant Ortiz then sent that information to Earl, who was employed at defendant Lazer, in violation of Hub Group policy and her and Earl's obligations to Hub Group.

141.  Defendants, by and through Earl and Ortiz, impaired the confidentiality of the confidential information and Trade Secrets contained on a protected computer. Earl impaired the confidentiality of this information by sharing it with his subsequent

46515876_1.docx

employer, Lazer.  Ortiz impaired the confidentiality of this information by emailing and sharing it with Earl while he was employed at Lazer.

142.   Earl and Ortiz made such communications with the intent to profit from Hub Group, as evidenced by communications reflecting Earl's desire to take over customer business from Hub Group for Lazer, in violation of agreements (implied and explicit) not to utilize Hub Group's confidential information or Trade Secrets for any purpose other than in furtherance of Hub Group's legitimate business.

143.   Defendants' conduct violates the Computer Fraud and Abuse act, 18 U.S.C. § 1030, et seq.

144.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1030(a)(2)(C), Hub Group has suffered damage in the form of impairment to the confidentiality, integrity, and availability of data and information on its protected computer, which has caused Hub Group irreparable injury.

145.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1030(a)(2)(C), Hub Group has suffered and will continue to suffer financial loss in excess of $5,000.00, including the harm caused by Defendants' actions, the cost to remedy and discover the extent of the harm, as well as and additional expenditures that will be necessary to investigate, assess and remedy Defendants' violation of this statute.

146.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1030(a)(2)(C), Hub Group has suffered damages and loss and are entitled to compensatory damages, injunctive relief, and other equitable relief and attorneys' fees allowable under 18 U.S.C. § 1030(g) in an amount to be determined according to proof at trial.

## <u>CLAIM FOR RELIEF 12:</u>
### <u>VIOLATION OF CALIFORNIA PENAL CODE § 502</u>
#### <u>(Against All Defendants)</u>

147.   Hub Group incorporates herein by reference all other paragraphs of this

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Complaint as though fully set forth herein.

148.   Defendants have violated California Penal Code sections 502, subdivisions (c)(1), (c)(2), and (c)(3) by: on their own account or through their agents, employees, and assigns (1) knowingly accessing and without permission altering, damaging, deleting, destroying, or otherwise using any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data; (2) knowingly accessing and without permission taking, copying, or making use of any data from a computer, computer system, or computer network, or taking or copying any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network; and (3) knowingly and without permission using or causing to be used computer services.

149.   Earl and Ortiz were not authorized to access or utilize Hub Group's computer network or use its data, computers, computer systems, or computer network, or to take possession of its data, documents, materials, or information residing on its computer network for their own benefit or the benefit of Lazer.

150.   Defendants, by and through Earl and Ortiz, knowingly accessed Hub Group's computer networks, and used its data, computers, computer systems, and computer network in order to acquire for their own benefit and profit, the property, confidential information, and data of Hub Group without the permission of Hub Group and in direct breach of their obligations and promises to Hub Group, actions that occurred both before, during, and after the time period that the Earl had accepted employment at Lazer; Defendants knowingly took possession of, and/or copied and made use of Hub Group's data from Hub Group's computer, computer system, and computer network and took and/or copied Hub Group's documents and materials residing on Hub Group's secure computer network for their own benefits, and without the permission of Hub Group.

151.   As a direct and proximate result of Defendants' unlawful conduct under

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

California Penal Code section 502, Defendants have caused loss to Hub Group in an amount to be proven at trial, but in excess of the jurisdictional minimum of this Court. Hub Group seeks compensatory damages, in an amount to be proven at trial, and injunctive or equitable relief.

152.   In engaging in the wrongful conduct described herein, Defendants have acted and continue to engage in conduct that constitutes a willful violation of California Penal Code section 502, subdivision (c), and that is oppressive, fraudulent, and/or malicious, thus entitling Hub Group to punitive and exemplary damages against Defendants, and each of them, in an amount sufficient to punish them for such conduct, pursuant to California Penal Code section 502, subdivision (e)(4).  Furthermore, as a result of Defendants' unlawful conduct, Hub Group is entitled to recover its reasonable attorneys' fees pursuant to California Penal Code section 502, subdivision (e).

## **PRAYER FOR RELIEF**

WHEREFORE, Hub Group prays for judgment and relief against Defendants, and each of them, as follows:

1.   For general damages both economic and non-economic in an amount according to proof, but in excess of the minimum jurisdiction of this Court;

2.   For special damages in an amount according to proof, but in the excess of the minimum jurisdiction of this Court, in order to compensate Hub Group for its lost profits and business advantage, and all damages flowing from Hub Group's loss of profits and loss of business advantage;

3.   For all costs incurred in this suit;

4.   For all interest as allowed by law;

5.   For punitive damages, as allowed by law, in an amount to be ascertained, according to proof, that will sufficiently punish all named Defendants, make an example of them, and deter future conduct.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6.      For the disgorgement of all profits and monies that Defendants have made unfairly in violation of Plaintiff's rights;

7.      For reasonable attorneys' fees and costs, as allowed by law, including but not limited to lodestar multipliers, for the time that Plaintiff's attorneys spend pursuing Hub Group's claims against all named Defendants, pursuant to contract, and all applicable statutes;

8.      That a preliminary, and permanent injunction be entered against Defendants and all persons or entities acting in concert with them,

(a)      Prohibiting Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from using, disclosing, or transmitting Hub Group's sensitive, proprietary, or a confidential information or trade secrets specifically identified above, including but not limited to Hub Group's client information;

(b)      Requiring Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, to immediately account for and return to Hub Group all original documents, records, and materials containing or reflecting such information, and all copies thereof;

(c)      Prohibiting Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from soliciting or handling business from any former, current or prospective customers of Hub Group, based in whole or in part on any sensitive, confidential, or proprietary information or trade secret belong to Hub Group;

(d)      Prohibiting Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from handling business from the customer of Hub Group described in Paragraph 26, above;

(e)      Requiring Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, to submit their computers and electronic devices at Defendants' expense to a computer forensic expert of Hub Group's

31

46515876_1.docx

choosing to ensure that Hub Group's trade secrets and confidential or proprietary data do not exist on those computers or devices and have not been further disseminated;

(f)    Except and only to the extent otherwise required by Court order, prohibiting Defendants Earl, Ortiz and Lazer and each of them, and anyone working in concert with them, from destroying, altering, transmitting, or moving any documents, in whatever form, that may contain or reflect any of Hub Group's sensitive, proprietary, or confidential information or trade secrets; and

(g)    Prohibiting or requiring any and all other such acts as the Court deems appropriate for injunctive relief; and

10.    For other and further relief as the Court may deem just and proper.


DATED:  March 24, 2021              OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.



                                   By:  /s/ STUART TOCHNER
                                        STUART TOCHNER
                                        GRAHAM M. HOERAUF
                                        KRISTIN N. KOVACICH

                                   Attorneys for Plaintiff
                                   HUB GROUP, INC.

32

46515876_1.docx